**CLARKSON LAW FIRM, P.C.**
Ryan Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
633 Howard St.
San Francisco, CA 94105
Tel: (415) 651-7990

**CLARKSON LAW FIRM, P.C.**
Shireen Clarkson (SBN 237882)
*sclarkson@clarksonlawfirm.com*
Yana Hart (SBN 306499)
*yhart@clarksonlawfirm.com*
Cassandra Rasmussen (*phv forthcoming*)
*crasmussen@clarksonlawfirm.com*
Jay Zheng (SBN 363184)
*jzheng@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MADISON SURBER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OURA INC., OURA HEALTH OY d/b/a OURARING INC., and subsidiaries,<br><br>Defendants. | Case No. 3:26-cv-8686<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

## TABLE OF CONTENTS

**Page No.**

I. INTRODUCTION ..... 1
II. JURISDICTION ..... 6
III. VENUE ..... 6
IV. DIVISIONAL ASSIGNMENT .....
V. PARTIES ..... 7
A. Plaintiff Surber ..... 7
B. Defendants Oura Inc. and Oura Health Oy d/b/a Ouraring Inc. ..... 8
VI. FACTUAL ALLEGATIONS ..... 9
A. Defendants Unlawfully Capitalize on Consumers' Desire for Accurate Sleep Stage Tracking ..... 9
B. Defendants' Challenged Representations Are False and Misleading ..... 13
C. Lawful Competitors Either Refrain from Overstating Sleep Stage Accuracy or Rely on True Neurological Sensors ..... 19
D. Defendants Built a Uniform and Coordinated Deceptive Advertising Campaign Centered on the False Promise of the Challenged Representations ..... 20
E. Consumers Rely on Defendants' Challenged Representations and Use the Products to Track Their Sleep Stages ..... 25
F. Plaintiff's Purchase Experience and Reliance on Defendants' Fraudulent Challenged Representations ..... 26
G. Defendants Knew that their Challenged Representations Were False ..... 27
H. The Unpurchased Products Are Substantially Similar to the Purchased Product ..... 30
I. Lack of Adequate Remedy at Law ..... 30
VII. CLASS ACTION ALLEGATIONS ..... 31
VIII. CAUSES OF ACTION ..... 34
IX. PRAYER FOR RELIEF ..... 50

Plaintiff Madison Surber ("Plaintiff"), individually and on behalf of all others similarly situated, as more fully described herein (the "Class" and "Class Members"), brings this class action complaint against Defendants Oura Inc., Oura Health Oy d/b/a Ouraring Inc., and subsidiaries (collectively "Oura" and "Defendants"), and alleges as follows:

## I. INTRODUCTION

1. Millions of Americans suffer without a good night's sleep. According to the CDC, more than one third of American adults are not getting enough sleep regularly.[1] Insufficient sleep is a prominent and pervasive problem in today's society and is linked to depression, ADHD, obesity, Type 2 diabetes, cardiovascular disease, cancer, and Alzheimer's disease.[2] Against this backdrop, sleep has become a major health priority for American consumers, who increasingly turn to sleep-tracking technologies marketed as offering practical and reliable real-time monitoring of sleep quality and duration, in comparison to standard sleep measurement techniques done mostly in laboratories.[3] The market size of global sleep trackers, valued at $6.76 billion in 2025, is projected

---

[1] *1 in 3 Adults Don't Get Enough Sleep,* CDC (Feb. 18, 2016), https://archive.cdc.gov/#/details?url=https://www.cdc.gov/media/releases/2016/p0215-enough-sleep.html; *see also Sleeping Aids Market Demand & Insights, Global Analysis Report, 2026-2034*, POLARIS MARKET RESEARCH (2025), https://www.polarismarketresearch.com/industry-analysis/sleeping-aids-market (noting that 12% of Americans suffer from chronic insomnia, and often turn to sleep-aid products).

[2] *See* Kristen L. Knutson et. al, *Role of Sleep Duration and Quality in the Risk and Severity of Type 2 Diabetes Mellitus*, 166 ARCH INTERN MED. 1768 (2006), https://pubmed.ncbi.nlm.nih.gov/16983057/ (linking sleep loss to increased diabetes risk); Patrick H. Finan et. al, *The Effects of Sleep Continuity Disruption on Positive Mood and Sleep Architecture in Healthy Adults*, 38 SLEEP 1735 (2015), https://gwern.net/doc/zeo/2015-finan.pdf (sleep deprivation and disruption can lead to a decrease in positive mood); Vijay K. Chattu et. al., *The Global Problem of Insufficient Sleep and Its Serious Public Health Implications*, 7 HEALTHCARE (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6473877/ ("[g]ood sleep is necessary for good physical and mental health and a good quality of life"); Magdalena M. Pankowska et al., *Prevalence and Geographic Patterns of Self-Reported Short Sleep Duration Among US Adults, 2020*, 20 PREVENTING CHRONIC DISEASE E53 (2023), https://www.cdc.gov/pcd/collections/pdf/Sleep_Deprivation_collection_508.pdf (linking the risk of diabetes, cardiovascular disease, obesity, and depression to insufficient sleep); Neil Howe, *America The Sleep-Deprived*, Forbes (Aug. 18, 2017), https://www.forbes.com/sites/neilhowe/2017/08/18/america-the-sleep-deprived/?sh=684e9c611a38.

[3] Evan D Chinoy et al., *Performance of Four Commercial Wearable Sleep-Tracking Devices Tested Under Unrestricted Conditions at Home in Healthy Young Adults*, 14 NATURE AND



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

to reach $25 billion in 2034.[4] Oura, the Defendants named here, built their business at the center of that growth.

2. Every morning, when millions of people wake up, they reach for their phone before they open their eyes—not to check messages, but to check how they slept. They see a number from 0 to 100, the total sleep score telling them how well they slept. The next set of measurements follow: the time spent in deep sleep, in REM sleep, and in light sleep; sleep efficiency, time in bed, restfulness, awake time; and other similar markers. For a consumer who has spent years exhausted, anxious, and struggling with sleep, that number feels like an answer. It tells them if the last night's rest helped or hurt. It tells them what to do differently. Consumers trust this number because Oura told them they could.

/ / /

SCIENCE OF SLEEP 493 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8957400/; *Sleep Tracking and 'Sleepmaxxing' Change Bedtime Behaviors — and Keep Some Americans Awake at Night*, AMERICAN ACADEMY OF SLEEP MEDICINE (Jan. 26, 2026), https://aasm.org/sleep-tracking-and-sleepmaxxing-change-bedtime-behaviors-and-keep-some-americans-awake-at-night/; Ashwini Nagappan et al., *Patterns of Ownership and Usage of Wearable Devices in the United States, 2020-2022: Survey Study*, 26 J. MED. INTERNET RSCH. (2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11316147/.

[4] *Sleep Trackers Market Size, Share & Industry Analysis, By Technology (Actigraphy Based, Polysomnography-Integrated, HRV-Focused, Oximetry-Based ($SpO_2$) Devices, and Others), By Device (Watches, Bands, Rings, and Others), By Application (Personal Wellness & Lifestyle Improvement, Clinical & Health Monitoring, Sports & Performance Optimization, and Others), By End User (Business to Business and Business to Consumer), and Regional Forecast, 2026-2034*, FORTUNE BUSINESS INSIGHTS, https://www.fortunebusinessinsights.com/sleep-trackers-market-113884 (last updated June 15, 2026).




3. Oura built an $11 billion company on that trust. To capitalize on consumers' desire for a tracker that could actually track sleep and monitor their sleep cycles Oura sold expensive tracking rings, priced at $300 and up, advertising exactly that: that Oura rings are capable of seeing what only a hospital sleep lab can see, including the four different stages of sleep: Wake, Light NREM, Deep NREM, and REM. Oura did not just claim to measure a heartbeat or a temperature, but the exact stage of sleep the wearer is in—which in reality requires electrodes in the scalp and sensors on the eyes, as only a hospital or other clinical setting can do. Yet Oura claimed that their ring—which uses no such technology—was "[b]uilt for accuracy" and delivers "Unparalleled Accuracy." Oura even quantified it, telling consumers that their Oura rings achieve these measurements with "79%" accuracy and most recently "95% Sleep Staging Accuracy compared to clinical sleep lab." These marketing messages promising nearly 100% accuracy of sleep stage

tracking were spread across every channel Oura controls: their websites, their retail-partners, and through their daily presence on social media.







4. But in reality, Oura rings cannot measure one's sleep or cycles. That's because sleep happens in the brain, not on one's finger. It is defined by brain electrical activity, eye movements, muscle tone, and other signals measured through electrodes placed on the scalp, leads on the eyes, and sensors on the chin. Defendants' ring does not measure any of these parameters, it cannot see the brain, and it cannot track sleep or sleep cycles. Instead, Oura's AI models are doing guess work as to what may be happening, based on improper inputs, and thus taking advantage of desperate consumers who struggle with their sleep or are concerned for their health by selling faulty AI-based inference as reliable science.

5. Oura knows as much, and even admits so in their own technical materials (buried far from the marketing claims that drive the sales), stating that using an Oura ring product is not the same as a polysomnography ("PSG") sleep study because the Oura ring "does not measure electrical

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

brain activity or eye movements." But prominently, Oura continues to claim its ability to measure sleep stages and cycles, and attests to the accuracy of those measurements.

6. Worse yet, Oura touts that the products are backed by "25+ PhDs working across an in-house interdisciplinary science team," to reassure consumers about the Oura ring's ability to track sleep and build credibility, touting that real doctors made these rings. Consumers have no reason to doubt the claims – after all, doctors purportedly built this product.

7. Oura's marketing strategy worked: consumers bought the Products because they believed the sleep tracking representations. In 2025 alone, Oura sold nearly 3 million rings, reaching over $1 billion in sales.

8. Consumers have no way to know that Oura's promises about sleep tracking were false. They are not doctors or scientists. With the rapidly developing technology that presently exists today, consumers reasonably believe this is possible. They can't parse through all the technical documents to find the confusing fine print disclosure that Oura hides. Instead, consumers trust Oura's prominent marketing promises and, ultimately, the numbers and sleep measurements they receive from Oura.

9. The law does not allow this type of deceptive practice: to boldly make a claim at the point of sale regarding accurate tracking of sleep scores and sleep stages with 79% to 95% accuracy, and then disclaim it quietly in a confusing manner, and in a manual no consumer will ever read.

10. The Products at issue are all versions and models of Defendants' Oura Ring sleep tracker products as sold to consumers in the United States, regardless of the Products' size or other variations, including colors, materials, or additional features. The Products include, but are not necessarily limited to, the following product lines:

a) Oura Ring 5;

b) Oura Ring 4;

c) Oura Ring 4 Ceramic.

11. **Primary Dual Objectives.** Plaintiff brings this action, individually and in a representative capacity on behalf of those similarly situated consumers who purchased the Products during the relevant Class Period (Class and/or Subclass defined *infra*), for dual primary objectives:

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

One, Plaintiff seeks, on behalf of herself and the Class/Subclass, injunctive relief to stop Defendants' unlawful and fraudulent advertising, marketing, and sale of the Products, in order to avoid or mitigate the risk of deceiving the public into believing that the Products conform to the fraudulent advertising, by requiring Defendants to change their business practices, which may include one or more of the following: cessation of the deceptive advertising practices; cessation of false claims about the Products' efficacy; and/or discontinuance of the Products' manufacture, marketing, and/or sale. Two, Plaintiff seeks, on behalf of herself and the Class/Subclass, a monetary recovery of the price premium and/or full restitution for the amount Plaintiff and consumers overpaid for Products that should have, but failed to comport with the advertised representations (which may include, for example, damages, restitution, disgorgement, and/or any applicable penalties, fines, or punitive/exemplary damages) solely to the extent that the causes of action pled permit such recovery.

## II. JURISDICTION

12. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13. This Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves of this forum by conducting substantial business within California such that Defendants have significant, continuous, and pervasive contacts with the State of California.

## III. VENUE

14. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants Oura Inc. and Ouraring are headquartered and maintains their principal places of business in this District, and because a substantial part of the events and misrepresentations giving rise to Plaintiff's claims occurred in this District. Specifically, Defendants deliberately marketed, advertised, and sold the Products within this District, and the marketing at issue here emanated from this district.

## IV. DIVISIONAL ASSIGNMENT

15. Defendants Oura Inc. and Ouraring have principal places of business in San Francisco County, California where Defendants make a substantial part of the Challenged Representations (defined below). Accordingly, assignment to the San Francisco Division is proper pursuant to Civil L.R. 3-2(c) and Civil L.R. 3-2(d).

## V. PARTIES

### A. Plaintiff Surber

16. Plaintiff Madison Surber is, and at all relevant times was, an individual residing in the state of California.

17. On or around May 22, 2025, Plaintiff purchased the Oura Ring 4 Gold for approximately $513.68 directly from Defendants' website while located in Los Angeles County, California.

18. Before making the purchase, Plaintiff was exposed to the Challenged Representations from Defendants' marketing campaign and the Product's webpage, leading Plaintiff to believe that the Product could provide accurate sleep stage tracking data.

19. At the time of purchase, Plaintiff did not know that the Challenged Representations were false—i.e., that the Product could not accurately and definitively measure sleep stages.

20. Plaintiff did not notice any disclaimer, qualifier, or other explanatory statement or information on the Product's webpage, labels, or packaging that contradicted the promises conveyed by the Challenged Representations.

21. Plaintiff would not have purchased the Product or would not have paid as much for the Product had Plaintiff known that the Challenged Representations were false—i.e., that the Products could not accurately and definitively measure sleep stages.

22. Plaintiff continues to see the Products available for purchase and would purchase them again if the Challenged Representations were in fact true.

23. Plaintiff does not personally know the mechanism or science behind the Products' promised sleep tracking features. Plaintiff does not possess any specialized knowledge, skill, experience, or education in sleep tracking products. Plaintiff also is not aware of whether

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Defendants have adopted neurological activity sensors to ensure that the Products become consistent with the Challenged Representations. As a result, Plaintiff had and still has no way of determining whether the Challenged Representations on the Products were and are true.

24. Plaintiff is, and continues to be, unable to rely on the truth of the Challenged Representations made in Defendants' advertising campaign and webpages.

25. Defendants continue to advertise, market, and sell the Products with the Challenged Representations. Plaintiff would like to purchase the Products in the future if they lived up to and conformed with the Challenged Representations. However, Plaintiff is an average consumer who is not sophisticated in neurological activity or sleep tracking technology. Plaintiff does not have any personal knowledge regarding the science or mechanism behind the Products' sleep tracking.

26. Thus, Plaintiff cannot accurately differentiate between wearable sleep tracker products that could provide accurate stage-by-stage sleep data and those that cannot. Since Plaintiff desires to purchase the Products again to obtain the benefits of the Challenged Representations—despite the fact that the Products were once marred by false advertising or warranties—Plaintiff would likely and reasonably, but incorrectly, assume the Products are true to and conform with the Challenged Representations as conveyed by Defendants' advertising campaign, including Defendants' website and social media platforms. Accordingly, Plaintiff is at risk of reasonably, but incorrectly, assuming that Defendants have fixed the Products such that Plaintiff may buy them again, believing they are no longer falsely advertised and warranted, and instead believing that they comply with the Challenged Representations. Plaintiff is therefore currently and in the future deprived of the ability to rely on the Challenged Representations to purchase the Products.

**B. Defendants Oura Inc. and Oura Health Oy d/b/a Ouraring Inc.**

27. Defendant Oura Inc. is a corporation with its principal office located at 222 Kearny St, San Francisco, CA 94108.

28. Defendant Oura Health Oy is a corporation under the laws of Finland, doing business as Ouraring Inc., a corporation with its principal place of business at 222 Kearny St, San Francisco, CA 94108.

29. At all times relevant to this action, Defendants were the owners, manufacturers, marketers, and/or distributors of the Products, and created, authorized, and controlled the use of the fraudulent advertising campaign to market the Products in California and the United States. Defendants and their agents promoted, marketed, and sold the Products at issue throughout the United States and, in particular, within this judicial district. The unfair, unlawful, false, deceptive, and misleading fraudulent advertising campaign of the Products was prepared, authorized, ratified, and/or approved by Defendants and their agents to deceive and mislead consumers in California and the United States into purchasing the Products. Directly and through their agents, Defendants have substantial contacts with and receives substantial benefits and income from and through the State of California and the United States. Defendants substantially profit from sales of the Products sold in California and the United States.

## VI. FACTUAL ALLEGATIONS

### A. Defendants Unlawfully Capitalize on Consumers' Desire for Accurate Sleep Stage Tracking

30. Consumers rely on and trust their sleep trackers for accuracy. According to a study from the American Academy of Sleep Medicine, 68% of consumers who use sleep trackers changed behavior upon learning more information about their sleep from using such trackers.[5] Inaccurate sleep tracking can therefore have a profound and material effect on consumers' lives. What is more, in order to "track" sleep patterns as advertised, consumers must rely on the Products' measurements repeatedly and over time, rather than in a single isolated instance. As such, each inaccurate measurement from one of Defendants' Products does not merely mislead once, but compounds, shaping consumers' understanding of their own sleep qualities night after night.

31. To capitalize on consumers' demand for accurate sleep tracking wearables, and in an effort to increase profits, Defendants prominently marketed their Oura Ring brand Products, including the Oura Ring 5, Oura Ring 4 and Oura Ring 4 Ceramic (the "Products"), as capable of

---

[5] *One in Three Americans Have Used Electronic Sleep trackers, Leading to Changed Behavior for Many*, AMERICAN ACADEMY OF SLEEP MEDICINE (Nov. 15, 2023), https://aasm.org/one-in-three-americans-have-used-electronic-sleep-trackers-leading-to-changed-behavior-for-many/.



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

accurately tracking a user's sleep stages (collectively, the "Challenged Representations"), deliberately leading reasonable consumers, including Plaintiff, to incorrectly believe that the Products could deliver such benefits. Fair and accurate depictions of representative examples of the Products' website and in-store advertising claims are included below, all conveying the same core message—that the Products accurately track sleep stages:

- "Built for accuracy."[6]
- "[T]he most accurate reading with 50+ health metrics."[7]
- "79% agreement with gold-standard polysomnography (PSG) for classifying the four stages of sleep (wake, light, deep, and rapid eye movement (REM) sleep)."[8]
- "95% Sleep Staging Accuracy Compared to clinical sleep lab"[9]
- "Unparalleled Accuracy"[10]
- "Smart Sensing technology adapts to your finger to deliver highly accurate, continuous data."[11]
- "Wake up to in-depth analysis of your deep sleep, REM sleep, and light sleep from the night prior."[12]
- "Millions of Oura Members trust Oura to translate their body's messages into valuable, actionable insights."[13]
- "25+ PhDs working across an in-house interdisciplinary science team."[14]
- "[T]ranslating your data and lifestyle habits into deeply personal insights that power your lifelong health journey."[15]

---

[6] Defendants' website, https://ouraring.com/ (last visited Aug 19, 2026).
[7] *Id.*
[8] *Oura's New Sleep Staging Algorithm: More Accurate Than Ever Before*, OURA (Nov. 16, 2022), https://ouraring.com/blog/new-sleep-staging-algorithm/.
[9] *Oura Ring 5*, OURA, https://ouraring.com/store/rings/oura-ring-5 (last visited Aug 17, 2026).
[10] *Oura Ring 4*, OURA, https://ouraring.com/blog/smart-sensing/ (last visited Aug 17, 2026).
[11] *Oura Ring 4 Ceramic*, OURA, https://ouraring.com/store/rings/oura-ring-4-ceramic (last visited Aug 17, 2026).
[12] *Supra* note 9.
[13] *WHY OURA, A First-of-Its-Kind Smart Ring*, OURA, https://ouraring.com/why-oura (last visited Aug 17, 2026).
[14] *Id.*
[15] *Id.*

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

- "Brighter moods, better energy, improved immunity— it all starts with sleep."[16]
- "Discover how much time you spend in each sleep stage (light, deep, and REM) and what it means for your wellbeing."[17]
- "Wake up to in-depth analysis about your sleep, so you can improve your habits and transform how you feel."[18]
- "Your score is based on how long you spent in each sleep stage and key signals like how long it took you to fall asleep and the timing of your sleep."[19]
- "Sleek, comfortable and accurate"[20]
- "Oura Ring: An Alternative to PSG Sleep Studies"[21]
- "Built for accuracy . . . so you can stay close to your health."[22]

32. Challenged Representations are prominently displayed throughout Defendants' pervasive advertising campaign, e.g., Defendants' website, social media, the Product page where consumers select and purchase a Product, Defendants' primary marketing materials, and Defendants' dedicated blog content, designed to capture consumers' attention at the point of purchase. The Challenged Representations are there to reassure and promise consumers that this premium-priced wearable device will deliver clinical-grade insight into the user's sleep patterns that a basic fitness tracker cannot.

33. However, the Products lack the sensors that are required to directly measure the neurological activities that clinically define sleep stages. The proper way to measure sleep is polysomnography ("PSG"), which includes brain wave signals ("EEG"), eye movement signals ("EOG"), cardiac signals ("ECG"), muscle activity ("EMG"), and, optionally, finger

---

[16] *SLEEP & REST, All You Have to Do Is Sleep—The Rest Will Follow*, OURA, https://ouraring.com/sleep-and-rest (last visited Aug 17, 2026).
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] Oura Team, *What Is a Polysomnography (PSG) Sleep Study?*, OURA (Dec. 6, 2022), https://ouraring.com/blog/what-is-a-polysomnography-psg-sleep-study-and-how-is-oura-different/ (last visited Aug 19, 2026).
[22] Oura Ring 4, OURA, https://ouraring.com/store/rings/oura-ring-4 (last visited Aug 19, 2026).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

photoplethysmography ("PPG").[23] EOG is necessary for measuring the sleep stage known as REM "due to the rapid eye movement which defines this sleep stage."[24] Similarly, EEG is necessary to discern when the deep sleep stage is activated, specifically "characterized by large amplitude slow-wave[]" brain activity.[25] By using this combination of data points, PSGs can accurately identify the electrophysiological patterns experienced in each stage of sleep that an individual experiences.[26] Yet the Products do not utilize the necessary data to accurately depict sleep stages. Instead, they infer sleep stage data from tracking heart rate, physical movement, peripheral skin temperature, and in newer models, blood-oxygen trends—none of which measure neurological activity. The Products cannot provide accurate stage-by-stage sleep data, which can become meaningfully less reliable depending on a variety of factors, such as age.[27]

34. Given the known sensor limitations of finger-worn wearables and the established clinical requirements for sleep stage tracking, Defendants knew that consumers would rely on the Products' Challenged Representations in deciding to purchase a device that costs significantly more than competing wearables. Yet Defendants' marketing offered a categorical assurance of accuracy, without adequate caveat, creating a misleading impression of the Products' actual capabilities that does not reflect the reality of their sensor-based limitations.

35. Consumers are not sleep experts who can reasonably be expected to discern whether the Products measure the correct metrics to track their sleep stages, as promised in Defendants' pervasive advertising campaign touting the Challenged Representations. Nor are they required to have such expertise. Consumers purchase wearable sleep tracker products in ordinary online shopping settings without undergoing the kind of deliberative process associated with purchasing a house or even a car. When faced with Defendants' marketing campaign, saturated with the

[23] Marco Altini, *et al.*, *The Promise of Sleep: A Multi-Sensor Approach for Accurate Sleep Stage Detection Using the Oura Ring*, 21 SENSORS (2021), https://www.mdpi.com/1424-8220/21/13/4302.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] Mary Emma Searles, et. al., *Performance Evaluation of Consumer Sleep-Tracking Wearables and Nearables in Healthy Young and Older Adults*, 7 SLEEP ADVANCES (2026), https://pmc.ncbi.nlm.nih.gov/articles/PMC12936866/pdf/zpag006.pdf.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Challenged Representations, reasonable consumers are entitled to rely on any such representation instead of second-guessing it and researching medical literature.

36. As a result of Defendants' deceptive advertising and marketing practices, consumers, including Plaintiff, pay a premium for Products that, in reality, cannot accurately track their sleep stages.

37. Through falsely, misleadingly, and deceptively labeling, packaging, and advertising the Products with the Challenged Representations, Defendants sought to take advantage of consumers' desire for, perceived value of, and willingness to pay more for wearable sleep tracking products that can provide accurate stage-by-stage sleep data. In this way, Defendants have charged consumers a premium for the Products falsely advertised and warranted with the Challenged Representations while reaping the financial benefits. Defendants have done so at the expense of unwitting consumers as well as Defendants' lawfully acting competitors, whose products actually measure brain signals, thus giving Defendants an unfair competitive advantage. Accordingly, Defendants' Challenged Representations are misleading and deceptive, and therefore unlawful.

### B. Defendants' Challenged Representations Are False and Misleading

38. The reliable clinical standard for measuring sleep stages is PSG, which records the neurological signals that clinically define sleep stages, typically including EEG, EOG, ECG, and EMG.[28]

39. Modern sleep medicine has relied on a sleep staging paradigm recommended by the American Academy of Sleep Medicine that includes five stages: wake, stage 1 (N1), stage 2 (N2), stage 3 (N3), and rapid eye movement (REM) sleep.[29] Under such sleep staging criteria, as one NIH-published clinical reference explains, "[t]he scoring of sleep stages depends on three parameters: electroencephalography (EEG), electrooculography (EOG), and electromyography (EMG)."[30] REM and non-REM sleep are recognized based on these parameters.[31] Under sleep

---

[28] Altini, et al., *supra* note 23.

[29] Brendan T Keenan & Ulysses J Magalang, *The AASM Sleep Staging Paradigm Gains Data-Driven Support*, 49 SLEEP (2026), https://academic.oup.com/sleep/article/49/2/zsaf343/8305738.

[30] Thomas Freedom MD, *Sleep and Parkinson's Disease*, 53 Disease-a-Month 275 (2007), https://www.sciencedirect.com/science/article/abs/pii/S0011502907000089.

[31] *Id.*

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

staging criteria, REM sleep is defined by three features: rapid eye movements on EOG, muscle atonia on EMG, and EEG desynchronization.[32] Therefore, in addition to cerebral waves, two of these three defining characteristics require monitoring of eye movements via EOG and muscle tone via EMG. REM sleep takes its very name from the "rapid eye movements" that define it. A device that cannot measure eye movement cannot directly detect the stage that is defined by eye movement.

40. EEG is necessary to detect deep sleep. Deep sleep, also known as Stage N3 or slow-wave sleep, is currently defined by American Association of Sleep Medicine's guidelines in the EEG as waves with a frequency of 0.5–2.0 Hz and a minimum amplitude of 75 µV, with N3 sleep defined by the presence of at least 20% slow waves in a 30-second "epoch" of sleep.[33] These large-amplitude slow waves are a direct measurement of synchronized cortical brain activity that can only be captured by EEG.[34] A device that cannot measure brain activity cannot directly detect the stage that is defined by brain activity.

41. The Products contain none of these sensors—no EEG, no EOG, no EMG, and no ECG. As a categorical matter, a finger-worn ring cannot accommodate the scalp electrodes, eye leads, and chin leads that PSG requires to directly measure the neurological signals defining each sleep stage.

42. Instead, the Products *infer* sleep stage estimates by applying a proprietary, undisclosed machine learning algorithm to peripheral physiological signals: heart rate, heart rate variability, physical movement, skin temperature, and, in newer models, blood oxygen trends. None of these signals directly measure neurological activity. Defendants' own technical blog content concedes that polysomnography "uses electroencephalography (EEG) to measure electrical brain waves to

[32] Andres A Gonzalez et al., *Sleep Stage Scoring*, MEDSCAPE, https://emedicine.medscape.com/article/1188142-overview#a2 (last updated Aug. 12, 2025).

[33] *Deep Sleep: What Is Stage 3 Sleep?*, THE BETTER SLEEP CLINIC, https://thebettersleepclinic.com/blog/deep-sleep-what-is-stage-3-sleep (last visited Aug 17, 2026); Shaun Davidson et al., *Is It Time to Revisit the Scoring of Slow Wave (N3) Sleep?*, 48 SLEEP (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12515605/.

[34] Toru Ishii et al., *From Macro to Micro: Slow-Wave Sleep and Its Pivotal Health Implications*, 3 FRONTIERS IN SLEEP (2024), https://www.frontiersin.org/journals/sleep/articles/10.3389/frsle.2024.1322995/full.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

see which sleep stage you are in,"[35] and separately admits that "using an Oura Ring is not the same as a PSG (as it does not measure electrical brain activity or eye movements),"[36] an admission that directly contradicts Defendants' simultaneous representation on their web page that the Product "achieves 79% agreement with gold-standard polysomnography"[37] and is an "alternative to PSG Sleep Studies."[38]

43. The Products' limitation and lack of capability are inherent, not incidental, as well documented in peer-reviewed scientific literatures. The Products rely on cardiac and movement proxies rather than direct neurological measurement, as indicated in technical specifications on Products' webpage.[39]




44. Thus, the Products lack the fundamental capability to reliably and accurately measure sleep stages because they do not have the capability to measure the most primary and defining indicator of sleep stages—brain activity or eye movement. The data collected from the wearer does not uniquely correspond to specific sleep stages and is not a direct measurement of the brain processes and activity needed to define REM, light, and deep sleep. Signals such as heart rate and blood oxygen alone are not sufficient to determine sleep stages with clinical accuracy, because sleep stages are fundamentally defined by brain activity. These signals can improve stage estimation—particularly for identifying nighttime physiological patterns—but they remain proxy indicators

---

[35] Emilina Lomas, *Oura Accuracy Further Validated by New Study from the University of Tokyo*, OURA (Feb. 12, 2024), https://ouraring.com/blog/oura-ring-accuracy-validation-study-university-of-tokyo/?srsltid=AfmBOormXEZtNSRKOnfAm77e7zzN4Ldz_8JYppYHVwHA_zkIZKpic_h-.

[36] Oura Team, *supra* note 21.

[37] *Supra* note 8.

[38] Oura Team, *supra* note 21.

[39] *Supra* note 9–11.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

rather than direct measurements of the brain processes that define REM, light, and deep sleep. Because the Products cannot provide accurate data on sleep stages, Defendants have overstated the ability of their Products and thereby misleads consumers into believing that the information derived from the Products is more useful and valuable to their health than it actually is. Consumers do not expect that the Products' assessment of sleep stages, which Defendants consistently market as accurate, is only an inference and in fact not accurate at all.

45. Indeed, multiple peer-reviewed, independently funded scientific studies confirm the gap between Defendants' advertised stage-accuracy and the Products' real-world performance. Contrary to Defendants' self-funded scientific studies purporting 79% sleep tracking accuracy,[40] across peer reviewed studies, the Products are shown to be approximately 50% accurate at correctly detecting sleep stages. For example, in a recent study published in Nature, researchers gathered data over 45 nights from 45 different patients wearing Oura rings.[41] The study found that Oura rings underestimate light sleep by 13.84 minutes and deep sleep by 5.98 minutes, while overestimating REM sleep by 31.56 minutes.[42] The results suggest very limited accuracy in measuring sleep stages, i.e., wake, light sleep, deep sleep, and REM sleep, with the Oura ring achieving only 53.18% accuracy.[43] The researchers expressly note and warn that even if some devices may demonstrate reasonable agreement with PSG *on average*, this agreement masks substantial individual-level inaccuracies, prohibiting their use in clinical sleep medicine. Another study conducted by researchers from the University of Massachusetts found that Oura rings *cannot provide accurate stage-by-stage sleep data*.[44] The study found that Oura rings had significant differences from PSG in both the younger adults group and the older adults group, with lower accuracy in older adults.[45]

---

[40] *Supra* note 8.

[41] Sebastian Herberger et. al., *Performance of Wearable Finger Ring Trackers for Diagnostic Sleep Measurement in the Clinical Context,* NATURE (Mar. 19, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC11923143/pdf/41598_2025_Article_93774.pdf.

[42] *Id.*

[43] *Id.*

[44] Mary Emma Searles, et. al., *Performance Evaluation of Consumer Sleep-Tracking Wearables and Nearables in Healthy Young and Older Adults*, 7 SLEEP ADVANCES (2026), https://pmc.ncbi.nlm.nih.gov/articles/PMC12936866/pdf/zpag006.pdf.

[45] *Id.*

Tellingly, even Defendants' self-funded study found that the Products significantly underestimate the amount of time spent in REM, and are unreliable based on the amount of time the Products' data infers that the wearer may be in each sleep stage.[46] For example, the Products may overestimate light sleep when light sleep is shorter than 175 min and underestimate light sleep when it is longer than 240 min, and may overestimate deep sleep shorter than 40 min and underestimate deep sleep longer than 90 min.[47]

46. No consumer would understand Oura's promises of unparalleled accuracy to equate to the reality: a coin flip's chance of being correct. It is therefore no surprise that consumers across the internet are expressing their dissatisfaction with the Products' proven inability to accurately and definitively measure sleep stages:

*Consumer Complaint on Facebook #1*[48]


Oura Ring 5/4 Group · Join
Laura Blauser Miller · September 19, 2025 ·

Honestly I'm beginning to think this was such a terrible waste of money. I wake up middle of the night, last night 2:30 a.m. It tracks me as having a 94 sleep score and almost 9 hours of sleep, while I was awake from 2:30 on trying to sleep. Not only that, I went for a 15 to 20 minute walk this morning and only had 233 steps. Based on this information the health scores can't possibly be accurate.

/ / /

[46] Thomas Svensson et. al., *Validity and Reliability of the Oura Ring Generation 3 (Gen3) with Oura Sleep Staging Slgorithm 2.0 (OSSA 2.0) When Compared to Multi-Night Ambulatory Polysomnography: A Validation Study of 96 Participants and 421,045 Epochs*, 115 SLEEP MED 251 (2024), https://www.sciencedirect.com/science/article/pii/S1389945724000200?via%3Dihub.

[47] *Id.*

[48] *Oura Ring5/4 Group*, FACEBOOK, Post from Sept. 19, 2025, https://www.facebook.com/groups/945310367310036/posts/1341837010990701/ (last visited Aug 17, 2026).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

*Consumer Complaint on Facebook #2*[49]

**Summer Arrowsmith**
Mine also, I was awake rolling around till right before two AM when I finally got up and used the bathroom . I had a horrible nights rest and it said I did great 🧐🧐




*Consumer Complaint on Reddit*[50]

Last night I forgot to put my ring back on before going to sleep. I woke up in the middle of the night, realized it was off, and put it back on. Instead of handling that situation gracefully, Oura detected only the short portion of sleep after I put the ring back on and then used that incomplete data to generate a terrible Sleep/Readiness result.

The problem is not that the ring missed the first part of my sleep. That part is understandable. The ring was not on my finger, so obviously it could not collect data.

The unacceptable part is that Oura appears to treat the partial sleep session as a valid night and then gives me no meaningful way to fix it.

As far as I can tell:

- I cannot extend the sleep session to reflect when I actually went to bed.
- I cannot manually add the missing sleep duration.
- I cannot delete the incorrectly detected sleep session.
- I cannot mark the session as invalid.
- I cannot exclude this day from Readiness, trends, baselines, or long-term analysis.
- I can add a tag, but tags do not fix the score or prevent bad data from influencing the product.

That is a major oversight for a product that markets itself around recovery, readiness, and long-term health signals.

---

[49] *Id.*

[50] *Oura Needs a Way to Delete or Invalidate a Bad Sleep Session. This Is a Major Product Oversight*, REDDIT (June 28, 2026), https://www.reddit.com/r/ouraring/comments/1ui4xtr/oura_needs_a_way_to_delete_or_invalidate_a_bad/.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

47. Therefore, the Products' data points provide mere *inferences* to estimate sleep stages. The data collected from the wearer does not uniquely correspond to specific sleep stages and is not a direct measurement of the brain processes and activity needed to define REM, light, and deep sleep. Because the Products cannot provide accurate data on sleep stages, Defendants have overstated the ability of their Products and thereby mislead consumers into purchasing them and believing that the information derived from the Products is more useful and valuable to their health than it actually is.

**C. Lawful Competitors Either Refrain from Overstating Sleep Stage Accuracy or Rely on True Neurological Sensors**

48. Consistent with the science demonstrating that stage-by-stage sleep tracking requires measuring neurological activities, such as EEG, EOG, ECG, EMG, and, optionally, PPG,[51] other wearable smart ring sleep tracking products with similar sensors, which are sold by Defendants' competitors such as SleepOn and Circul, do not feature the misleading Challenged Representations touting stage-by-stage tracking accuracy.[52] Since rings and watches are inherently limited because they rely on indirect physiological signals—heart rate, HRV, movement, temperature, and breathing—that may correlate with sleep stages but do not define them, other competitors' wearable sleep tracking products utilize EEG-based headband systems or home polysomnography devices, which measure brain activity directly.[53]

49. By falsely marketing their product with the Challenged Representations, Defendants exploit vulnerable consumers who seek to understand and improve their sleep health, giving them a false sense of confidence in data that purports to rival clinical polysomnography but which in reality does not, and cannot. This deceptive labeling not only takes advantage of these consumers, but also provides Defendants with an unfair competitive advantage over other companies offering similar wearable sleep tracking products that measures proper neurological activities or refrain from making such misleading stage-by-stage accuracy claims.

---

[51] Altini et al., *supra* note 23.

[52] *See* SLEEPON, https://www.sleepon.us (last visited Aug 17, 2026); CIRCUL, https://circulsense.com (last visited Aug 17, 2026).

[53] *See*, *e.g.*, Muse, https://choosemuse.com/pages/science (last visited Aug 17, 2026).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

### D. Defendants Built a Uniform and Coordinated Deceptive Advertising Campaign Centered on the False Promise of the Challenged Representations

50. Oura Health Oy was founded in 2013 in Oulu, Finland, and launched its first product through a 2015 Kickstarter campaign that raised over $650,000, alongside a $2.3 million seed round led by Lifeline Ventures the same year.[54] Oura has since grown into one of the most highly valued companies in the wearable health technology space, reaching a valuation of approximately $11 billion following a Series E funding round in 2025, with over 5.5 million rings sold and revenue reported to exceed $1 billion in 2025.[55] Oura credits much of this growth to marketing that emphasizes the purported clinical-grade accuracy of its health tracking, including the Challenged Representations, amplified through social media posts, celebrity adoption, and influencer partnerships. Multiple celebrities, such as Jennifer Aniston, Prince Harry, and Kim Kardashian, adopted or endorsed the Products publicly and on social media, further fueling the Products' popularity.[56]

51. Defendants maintain consistent presence on social media, bombarding consumers with promotional materials. In addition to Defendants' primary website, ouraring.com, and multiplied social media accounts, including Facebook, Instagram, Pinterest, TikTok, X, and YouTube, all designed to promote the brand, as well as market the Products, in line with Defendants' strategy of presenting the Products as the clinically validated, scientifically rigorous leader in wearable sleep tracking. Defendants' fraudulent advertising campaign began in approximately 2015, as evidenced by their earliest Facebook promotional material, which, according to the publicly

---

[54] *Oura Health*, WIKIPEDIA, https://en.wikipedia.org/wiki/Oura_Health (last visited Aug 17, 2026).
[55] *Oura*, SILICON VALLEY INVESTCLUB, https://siliconvalleyinvestclub.com/oura/ (last visited Aug 17, 2026).
[56] Jennifer Maas, *Jennifer Aniston Reveals What Jimmy Kimmel Got Her 'Addicted' to That's Ruining Her Life (Video)*, THE WRAP (Sep. 14, 2021), https://www.thewrap.com/jennifer-aniston-jimmy-kimmel-oura-ring-toss-salad-morning-show-video/; Cheryl Wischhover, *Everything You Need to Know About Prince Harry's Sleep Tracker Fitness Ring*, VOX (Oct. 19, 2018), https://www.vox.com/the-goods/2018/10/19/17999542/prince-harry-oura-ring-sleep-tracker-australia; Rebekah Clark, *I Stay Awake at Night Thinking About the Great Sleep Kim Kardashian Is Getting*, GRAZIA, https://graziamagazine.com/articles/kim-kardashian-sleep-oura/ (last visited Aug 17, 2026).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

available webpage, was posted on March 3, 2015.[57] It has continued for nearly eleven years. Since that time, Defendants have maintained a consistent and active presence on social media platforms, regularly publishing promotional content to market their Products with Challenged Representations.

52. Defendants' Facebook account (@OURA) has attracted approximately 131,000 followers and makes new promotional posts on an almost daily basis.[58] Similarly, Defendants' X account (@ouraring) has accumulated approximately 55,300 followers and has made 20,200 posts to date.[59] Defendants' YouTube channel (@oura_ring) has attracted 23,400 subscribers and has consistently posted promotional videos.[60] Defendants' Instagram account (@ouraring) has approximately 1.1 million followers, with 1,254 promotional posts.[61] Defendants' TikTok account (@ouraring) has approximately 130,400 followers and has accumulated nearly 1 million cumulative "likes" on their promotional videos.[62] Defendants' social media presence and celebrity association strategy have been effective drivers of consumer adoption and brand trust in the accuracy of their health-tracking claims, including their Challenged Representations. Below is a representative

---

[57] OURA, Facebook (Mar. 3, 2015), https://www.facebook.com/photo/?fbid=818969114866129&set=a.818969028199471.
[58] OURA, Facebook, https://www.facebook.com/ouraring (last visited Aug 17, 2026).
[59] OURA, X, https://x.com/ouraring (last visited Aug 17, 2026).
[60] OURA, YouTube, https://www.youtube.com/@oura_ring/videos (last visited Aug 17, 2026).
[61] OURA, Instagram, https://www.instagram.com/ouraring/?hl=en (last visited Aug 17, 2026).
[62] Ouraring, TikTok, https://www.tiktok.com/@ouraring?lang=en (last visited Aug 17, 2026).

example: Defendants' "pinned" promotional video on TikTok that touting that Oura Ring 4 is "[m]ore accurate than ever":




53. In addition to the sheer volume and repetition of Defendants' advertisements, the modern digital landscape has made online advertising increasingly pervasive, targeted, automated, and personalized. A key example of this evolution is retargeted advertising, a practice in which companies deliver customized ads to individuals who have previously visited a retailer's website but left without completing a purchase.[63]

54. Retargeted advertising has long been recognized as an effective marketing strategy. Retargeting advertising has been found to increase the chance of converting site-visitors into paying customers by 70%, and to increase the advertiser's branded search exposure by at least 1000%.[64] In 2019, a large-scale randomized field experiment to study the effects of retargeted advertising found

---

[63] Ivan De Battista et al., *The Value of Retargeted Advertisements: An Empirical Study on Young People*, 12(1) Cogent Business & Management (2025), https://www.tandfonline.com/doi/full/10.1080/23311975.2025.2560646.

[64] ReadyCloud, *These 2018 Retargeting Statistics Prove It Works*, READYCLOUD (Apr. 12, 2018), https://www.readycloud.com/info/these-2018-retargeting-statistics-prove-it-works.



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

that retargeting caused 14.6% more users to return to the website within four weeks, with the effect increasing over time.[65]

55. Retargeting functionally involves pixels, which are pieces of code that advertisers often put on their websites. Such codes quietly tag website visitors so the advertiser can reconnect with them later through highly targeted advertisements.[66] For instance, if a consumer visits the advertiser's website and browses a few different pages, but doesn't fill out the contact form or make a purchase, retargeting pixels can help the advertiser reach them again by noting that website visit and sending data back to the advertising platform.[67] Based on the pixel data, advertisers can run advertisements to retarget people who have exhibited some promising behavior, such as a link click, a landing page visit, etc.—signs of interest in the advertiser's product or service.[68]

56. Therefore, it is no surprise that major social media platforms such as Meta (Facebook and Instagram) and TikTok offer sophisticated retargeting tools that dynamically generate customized ad variations for individual users based on engagement data and behavioral predictions. Meta refers to this feature as "Dynamic Creative," which Defendants actively utilize. Through this tool, Defendants' ad components, such as images, videos, and headlines, are automatically mixed and matched to produce countless personalized ad versions. This allows Defendants to continuously test and optimize deceptive messaging, ensuring that their false claims about the Challenged Representations reach consumers in the most persuasive form possible.[69] Similarly, TikTok's "Smart Creative" feature allows companies like Defendants to upload multiple creative assets—such as images, videos, text variations, and calls-to-action—which the platform then mixes and

---

[65] Navdeep S. Sahni et al., *An Experimental Investigation of the Effects of Retargeted Advertising*, 56(3) J. MARKETING RESEARCH (June 2019), https://www.jstor.org/stable/26966582.

[66] Farjad Taheer, *How Does a Retargeting Pixel Work? (3 Use Cases)*, OPTINMONSTER, https://optinmonster.com/how-does-retargeting-pixel-work/ (last updated July 30, 2025).

[67] Brian Jackson, *What Is Ad Retargeting – Complete Guide to Get Started*, KINSTA, https://kinsta.com/blog/ad-retargeting/ (last updated Aug. 28, 2025).

[68] *Id.*

[69] Business Help Center, *About Dynamic Creative*, META, https://www.facebook.com/business/help/170372403538781?id=244556379685063 (last visited Aug 17, 2025).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

matches algorithmically.[70] With Meta's "Dynamic Creative" feature and TikTok's "Smart Creative" feature, if an advertiser provides four variations each of primary text, description, headline, and creative asset, there are *1,820* possible ad combinations. This illustrates the complexity of tracking or analyzing every specific advertisement that an individual could be exposed to, since each user could see a distinct combination generated in real time by the platform's optimization algorithm.

57. Defendants' fraudulent marketing scheme utilizes such targeted advertising. As reflected in the archive entries, nearly all of Defendants' Meta Ads used one of Meta's dynamic services.[71] Under this system, the advertiser provides a set of promotional elements—such as images and text—with which Meta then automatically creates targeted combinations for specific audiences based on the available information it possesses regarding those users. Defendants employ this dynamic advertising system to promote the Products, allowing it to continually refine, retarget, and bombard consumers with a vast array of tailored ads—even those who have shown only minimal prior interest. This tactic ensures that Defendants' deceptive Challenged Representations follow consumers across platforms and reappears repeatedly in their feeds. It has also enabled Defendants' strategy of reusing the same advertising elements, such as video clips, in multiple ad variations that all communicate the same core messages of the Challenged Representations. Archived data further indicates that approximately *91* Meta advertisements are currently being actively run by Defendants, exponentially increasing the volume and reach of Oura's pervasive advertising campaign.[72] For every one of the approximately 91 ads, Defendants using Meta's dynamic advertising service further amplified the reach by automatically generating and disseminating additional retargeted ad variations using their creative elements.

---

[70] *About Smart Creative*, TIKTOK BUSINESS HELP CENTER, https://ads.tiktok.com/help/article/smart-creative (last updated July 2025).
[71] *Ad Library*, META, https://www.facebook.com/ads/library/?active_status=active&ad_type=all&country=US&is_targeted_country=false&media_type=all&q=ouraring&search_type=keyword_unordered&sort_data[direction]=desc&sort_data[mode]=total_impressions (last visited Aug 17, 2026)
[72] *Id.*

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

58. Although the sheer volume and persistence of Defendants' advertising make it impossible for consumers to recall every specific ad, Defendants' long-running and pervasive marketing campaign have uniformly conveyed the same core message to Plaintiff and other reasonable consumers—that their Products could provide accurate stage-by-stage sleep tracking. Over nearly a decade, Defendants have continuously disseminated thousands of advertisements across multiple social media platforms, employing algorithmic delivery and retargeting systems to ensure constant consumer exposure. Consumers scrolling through social media are thus repeatedly subjected to a steady stream of Defendants' content, all reinforcing the same false promise of the Challenged Representations.

**E. Consumers Rely on Defendants' Challenged Representations and Use the Products to Track Their Sleep Stages**

59. Reasonable consumers, including Plaintiff, purchase the Products for their represented ability to track sleep, including sleep stages, not as an incidental feature, but as the Products' core value proposition as marketed by Defendants. Consumer reviews confirm that sleep-stage tracking is the primary, and often sole, reason consumers purchase the Products. For example, one consumer (user name "JImw") reviewing the Products on Amazon.com explained: "I purchased this mostly to track my sleep."[73] Another review stated that "[t]he Oura Ring 4 is best for people who want passive, sleep-first health tracking without the distractions of a smartwatch."[74] This consumer's stated purchasing rationale, buying the Products specifically to obtain sleep data, is

---

[73] *Oura Ring 4*,Amazon (Mar. 6, 2026), https://www.amazon.com/Oura-Ring-Tracking-Wearable-Fitness/dp/B0D9WWB3WX/ref=sr_1_3?adgrpid=1337006712113942&dib=eyJ2IjoiMSJ9.ZKxTYNXyiY_znaufAwuqhLAwvdPTG4fG6FM_4OTBC3VhdauH35L75lyCnf3L0GNAEup6ewu5_zPCQlOUz3X4z-_-d1KAUv6Rjw1lqBwv-8FyHFFn-QCeGbu3K7A_eW0a-ypq4_gs_4KuulbOp-54zmgj29UDw_TP9YxSrO_0ZBkdWLzT-lujU3DVC0z-6fe-D-H9zM7NfgtZliy1wq3_5PFI8iWpH8t_PgKtyPP4DU8.w_8CBAaU_3doMEVOFB8jcE8Wl4yuioH5bPJNef465wI&dib_tag=se&gb=2&hvadid=83563324254790&hvbmt=be&hvdev=c&hvexpln=0&hvlocphy=79725&hvnetw=o&hvocijid=14460214653361831235--&hvqmt=e&hvtargid=kwd-83563286189405%3Aloc-190&hydadcr=7498_13441135&keywords=oura%2Bring%2Bamazon&mcid=71844d12a4953d0ab6974dedea4ae9a0&qid=1783633930&sr=8-3&th=1.

[74] Charlotte Lewis Finigan, Oura Ring 4 Review: My Honest Take After 365 Days of Tracking, PREVENTION (May 17, 2026), https://www.prevention.com/health/sleep-energy/a71219516/oura-ring-4-review/.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

representative of a broader pattern reflected across consumer reviews and online discussions, confirming that the Challenged Representations are material to the purchasing decisions of reasonable consumers, including Plaintiff.

### F. Plaintiff's Purchase Experience and Reliance on Defendants' Fraudulent Challenged Representations

60. The following is alleged based upon Plaintiff's personal knowledge:

a. **Exposure to Defendants' Deceptive Marketing Scheme.** Plaintiff first encountered Defendants' advertising in April 2025, when she saw a display for Oura rings at a Best Buy in West Hollywood, California. Plaintiff encountered Defendants' advertising on their official website and through the Best Buy product sales page when she purchased the Oura Ring 4 Gold online.

b. **Reliance on Defendants' Fraudulent Challenged Representations.** In purchasing the Oura Ring 4 Gold, Plaintiff relied on Defendants' representations and depictions promising Products' capability to provide accurate stage-by-stage sleep tracking. Plaintiff encountered these representations through Defendants' advertisements on their official website. Based on the consistent and uniform message conveyed through these representations, Plaintiff reasonably believed and expected that the Products could provide accurate stage-by-stage sleep tracking, just as Defendants' representations repeatedly depicted.

c. **Failure of the Product to Deliver the Advertised Benefits.** Plaintiff used the Product as instructed. Despite following all instructions, after a short period of wearing the device, it became obvious to Plaintiff that the device could not actually track the hours she slept, the times she awoke during sleep, or the quality of her sleep. She was extremely disappointed that the Products failed to deliver the accurate stage-by-stage tracking as prominently promised in Defendants' representations, and she derived no benefit from the use.

d. **No Actual Knowledge of Falsity.** At the time of purchase, Plaintiff did not know that the Challenged Representations were false in that Plaintiff did not know that the

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Products lack the necessary sensors.

e. **No Notice of Contradictions.** Plaintiff did not notice any disclaimer, qualifier, or other explanatory statement or information on the Products' labels or advertising that contradicted the prominently advertised Challenged Representations or otherwise suggested that the Products could not accurately and definitively measure sleep stages.

f. **Causation/Damages.** Plaintiff would not have purchased the Product had Plaintiff known that it could not accurately and definitively measure sleep stages.

g. **Desire to Repurchase.** Plaintiff continues to see the Products available for purchase and desires to purchase them again if the representations in the advertisements were in fact true.

h. **Lack of Personal Knowledge/Expertise to Determine Truth.** Plaintiff does not personally know what sensors are required to directly measure neurological activities that define sleep stages, and Plaintiff does not possess any specialized knowledge or general familiarity with the methods typically used to track sleep stages, such that Plaintiff does not personally know and cannot determine whether the Product could provide accurate stage-by-stage sleep tracking; and, therefore, Plaintiff has no way of determining whether the advertised representations are true.

i. **Inability to Rely.** Plaintiff is, and continues to be, unable to rely on the Products' advertisements, social media posts, and website listings.

### G. Defendants Knew that Their Challenged Representations Were False

61. Defendants knew that the Challenged Representations were false, misleading, deceptive, and unlawful at the time that Defendants manufactured, marketed, advertised, labeled, and sold the Products using the Challenged Representations to Plaintiff and the Class. Defendants intentionally and deliberately used the Challenged Representations, alongside their marketing campaign and brand strategy, to cause Plaintiff and similarly situated consumers to buy the Products with the belief that the Challenged Representations were true.

62. Defendants' own representations touting their scientific expertise confirm that Defendants knew that the Challenged Representations were false. Defendants market the Products

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

as the product of rigorous, in-house scientific development, representing to consumers that Oura employs "25+ PhDs working across an in-house interdisciplinary science team,"[75] and identifying named sleep scientists responsible for developing and validating the Products' sleep-stage tracking.[76] Having held out this team of doctorate-level scientists as the architects of the Products' sleep-tracking capabilities, Defendants cannot credibly claim ignorance of the clinical requirements for measuring sleep stages. As recognized by Oura's own employee, it is well-established science that PSG remains the reliable clinical standard for sleep-stage measurement, which requires EEG, EOG, and EMG.[77] A ring worn on the finger, lacking any of these sensors, cannot perform the function that Defendants' own scientists know is required to directly measure sleep stages. Defendants' scientific staff, the very personnel Defendants tout to consumers as lending credibility and accuracy to the Products' sleep-stage tracking, understood this distinction between direct measurement and inference.

63. Defendants' own self-funded research further confirms their actual knowledge of the Challenged Representation's falsity, acknowledging that the Products may overestimate light sleep when light sleep is shorter than 175 min and underestimate light sleep when it is longer than 240 min, and may overestimate deep sleep shorter than 40 min and underestimate deep sleep longer than 90 min.[78] Having funded and reviewed this research themselves, Defendants were therefore aware of these specific, quantified limitations in the Products' ability to accurately track sleep stages, yet continued to market the Products using the Challenged Representations without disclosing these known deficiencies to consumers.

64. Defendants named and marketed the Products with the Challenged Representations but opted to equip them with sensors in a manner that does not and cannot conform to the representations. Specifically, Defendants named and advertised the Products as capable of providing accurate stage-by-stage sleep tracking. However, the Products do not have the necessary sensors to

---

[75] *Supra* note 13.
[76] Emilina Lomas, *Inside the Ring: Developing Oura's Latest Sleep Staging Algorithm*, OURA (May 30, 2023), https://ouraring.com/blog/developing-ouras-latest-sleep-staging-algorithm/.
[77] Altini, et al., *supra* note 23.
[78] Svensson et. al., *supra* note 46.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

directly measure neurological activities that define sleep stages.

65. Defendants knew, or should have known, that the Challenged Representations would lead reasonable consumers into believing that the Products could provide accurate stage-by-stage sleep tracking data. Defendants advertised each of the Products with the Challenged Representations and utilized a pervasive advertising campaign to convey such promise. Defendants have an obligation under section 5 of the Federal Trade Commission Act, codified as 15 U.S.C. § 45, to evaluate their marketing claims from the perspective of a reasonable consumer. That means Defendants are statutorily obligated to consider whether the Challenged Representations, be they in isolation or in conjunction with their marketing campaign, would mislead reasonable consumers into believing that the Products could provide accurate stage-by-stage sleep tracking. Thus, Defendants either knew the Challenged Representations were misleading before they marketed the Products to the Class, including Plaintiff, or Defendants would have known they were deceptive had they complied with their statutory obligations.

66. Defendants also knew that the Challenged Representations were material to consumers when making their purchasing decisions. Manufacturers and marketers repeat marketing claims to emphasize and characterize a brand or product line, shaping the consumers' expectations, because they believe those repeated messages will drive consumers to buy the Product. Here, the constant, unwavering use of the Challenged Representations in the marketing for the Products evidence Defendants' awareness that the falsely advertised Product-attribute is important to consumers. It also evidences Defendants' intent to convince consumers that the Products conform to the Challenged Representations and, ultimately, drive sales.

67. Defendants, as the manufacturers and marketers of the Products, had exclusive control over the Challenged Representations in the Products' advertisements—i.e., Defendants readily and easily could have stopped using the Challenged Representations to sell the Products if they had chosen to do so. However, despite Defendants' knowledge of the Challenged Representations' falsity, and Defendants' knowledge that consumers reasonably rely on the Challenged Representations in deciding to buy the Products, Defendants deliberately chose to market the Products with the Challenged Representations, thereby misleading consumers into buying or

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

overpaying for the Products. Thus, Defendants knew, or should have known at all relevant times that the Challenged Representations mislead reasonable consumers, such as Plaintiff, into buying the Products to attain the product-attributes that Defendants falsely advertised and warranted.

**H. The Unpurchased Products Are Substantially Similar to the Purchased Product**

68. As described herein, the unpurchased Products are substantially similar to the purchased Product. All Products are manufactured, sold, marketed, advertised, labeled, and packaged by Defendants and sold under the same brand name, Oura.

69. All Products contain the same types of sensors, and are marketed directly to consumers for personal use. All Products are advertised with the same Challenged Representations, and Defendants buttress the Challenged Representations through a pervasive and consistent brand strategy effectuated through their marketing campaign to identify the Products as capable of providing accurate stage-by-stage sleep tracking. The misleading effect of the Challenged Representations on consumers is the same for all Products: consumers pay for products that could accurately track sleep stages, but receive Products that cannot.

**I. Lack of Adequate Remedy at Law**

70. Plaintiff and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

71. Injunctive relief is appropriate on behalf of Plaintiff and members of the Class because Defendants continue to misrepresent the Products with the Challenged Representation. Injunctive relief is necessary to prevent Defendants from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of affirmative disclosures, is necessary to dispel the public misperception about the Products that has resulted from years of Defendants' unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements that the Products' Challenged Representations are not true and which provide accurate information about the Products' true nature; and/or requiring prominent qualifications and/or disclaimers on the Products' front label concerning the Products' true nature.

An injunction requiring affirmative disclosures to dispel the public's misperception and prevent the ongoing deception and repeat purchases based thereon is also not available through a legal remedy (such as monetary damages).

72. Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

## VII. CLASS ACTION ALLEGATIONS

73. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and all others similarly situated, and as a member of the Classes defined as follows:

> **Nationwide Class:**
> All purchasers who, within the applicable statute of limitations periods, purchased the Products in the United States for purposes other than resale ("**Nationwide Class**"); and
>
> **California Subclass:**
> All purchasers who, within four years prior to the filing of this Complaint, purchased the Products in California for purposes other than resale ("**California Subclass**").

74. Excluded from the Class are: (i) Defendants, their assigns, successors, and legal representatives; (ii) any entities in which Defendants have controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

75. Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

76. **Numerosity:** Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the California Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the state of California. Accordingly, it would be impracticable to join all members of the Class before the Court.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

77. **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

a) Whether Defendants engaged in unlawful, unfair or deceptive business practices by advertising and selling the Products;

b) Whether Defendants' conduct of advertising and selling the Products with the Challenged Representations when they cannot accurately track sleep stages constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of Civil Code section 1750, et seq.;

c) Whether Defendants used the deceptive representation in connection with the sale of the Products in violation of Civil Code section 1750, et seq.;

d) Whether Defendants represented that the Products have characteristics or quantities that they do not have in violation of Civil Code section 1750, et seq.;

e) Whether Defendants advertised the Products with intent not to sell them as advertised in violation of Civil Code section 1750, et seq.;

f) Whether Defendants' labeling and advertising of the Products are untrue or misleading in violation of Business and Professions Code section 17500, et seq.;

g) Whether Defendants knew or by the exercise of reasonable care should have known their labeling and advertising was and is untrue or misleading in violation of Business and Professions Code section 17500, et seq.;

h) Whether Defendants' conduct is an unfair business practice within the meaning of Business and Professions Code section 17200, et seq.;

i) Whether Defendants' conduct is a fraudulent business practice within the meaning of Business and Professions Code section 17200, et seq.;

j) Whether Defendants' conduct is an unlawful business practice within the meaning of Business and Professions Code section 17200, et seq.;

k) Whether Plaintiff and the Class paid more money for the Products than they actually received;

l) How much more money Plaintiff and the Class paid for the Products than they actually received;

m) Whether Defendants' conduct constitutes breach of express warranty;

n) Whether Defendants' conduct constitutes breach of implied warranty;

o) Whether Plaintiff and the Class are entitled to injunctive relief; and

p) Whether Defendants were unjustly enriched by their unlawful conduct.

78. **Typicality:** Plaintiff's claims are typical of the claims of the Class Members she seeks to represent because Plaintiff, like the Class Members, also purchased Defendants' misleading and deceptive Products. Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiff and the Class sustained similar injuries arising out of Defendants' conduct. Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

79. **Adequacy:** Plaintiff is an adequate representative of the Class she seeks to represent because her interests do not conflict with the interests of the Class Members Plaintiff seeks to represent. Plaintiff will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions, including litigating complex questions that arise in consumer protection and class action cases.

80. **Superiority:** A class action is superior to all other available means of fairly and efficiently adjudicating the claims brought by Plaintiff and the Class. Common questions of law and fact predominate here, as each Class Member's claims arise from the same course of conduct by Defendants and require resolution of the same legal and factual issues. The injury each individual Class Member has suffered is small when compared to the burden and expense of individually prosecuting the complex and extensive litigation Defendants' conduct necessitates. It would be impossible for Class Members on an individual basis to effectively redress the wrongs done to them. Even if Class Members could afford such individual litigation, the courts cannot. Absent class-wide relief, Class Members will continue to suffer harm while Defendants continue to profit from their unlawful conduct without consequence or remedy. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system, particularly where the subject matter of the case may be technically complex. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

81. **Injunctive/Equitable Relief**. The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

## VIII. CAUSES OF ACTION

## <u>COUNT ONE</u>

## FRAUD BY MISREPRESENTATION

**(Brought by Plaintiff on behalf of the Nationwide Class, or Alternatively, the California Subclass)**

82. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

83. Plaintiff brings this claim against Defendants on behalf of herself and on behalf of the Nationwide Class under California law, or alternatively, the California Subclass.

84. Defendants affirmatively misrepresented the capabilities, quality, and nature of the Products when selling and marketing them.

85. Defendants also knew that their misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendants' representations in making purchasing decisions.

86. Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

87. Plaintiff and Class Members would have been reasonable in relying on Defendants' misrepresentations in making their purchasing decisions.

88. Plaintiff and Class Members had a right to rely upon Defendants' representations as Defendants maintained monopolistic control over knowledge of the true quality of the Products and control their advertisements directed to mislead consumers about the Products.

89. Plaintiff and Class Members sustained damages as a result of their reliance on Defendants' misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

## COUNT TWO

## UNJUST ENRICHMENT

**(Brought by Plaintiff on Behalf of the Nationwide Class, or Alternatively, the California Subclass)**

90. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

91. Plaintiff brings this claim against Defendants on behalf of herself and on behalf of the Nationwide Class under California law, or alternatively, the California Subclass.

92. By purchasing the Products, Plaintiff and members of the Class conferred a benefit on Defendants in the form of the purchase price of the Products.

93. Defendants had knowledge of such benefit and Defendants appreciated the benefit because, were consumers not to purchase the Products, Defendants would not generate revenue from the sales of the Products.

94. Defendants' knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants' fraudulent, misleading, and deceptive representations and omissions.

95. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result. Plaintiff seeks restitution only to the extent that legal claims do not provide full recovery.

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

**COUNT THREE**

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof. Code, §§ 17200, et seq.)**

**(Brought by Plaintiff on Behalf of the California Subclass)**

96. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

97. Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

98. This cause of action is brought pursuant to Business and Professions Code section 17200, *et seq.,* on behalf of Plaintiff and a California Subclass who purchased the Products.

99. California Business & Professions Code sections 17200, *et seq.* (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

100. Defendants, in their advertising and packaging of the Products, made false and misleading statements and fraudulent omissions regarding the quality and characteristics of the Products—specifically, the Challenged Representations—despite the fact the Products could not provide accurate stage-by-stage sleep tracking data because they lack the necessary sensors.

101. Defendants do not have any reasonable basis for the claims about the Products made in Defendants' advertising because the Products cannot provide accurate stage-by-stage sleep tracking, contrary to the Challenged Representations. Defendants knew, and still know, that the Products do not conform to Challenged Representations, though Defendants intentionally advertised and marketed the Products to deceive reasonable consumers into believing that they could not accurately and definitively measure sleep stages.

102. Defendants' labeling and advertising of the Products led to, and continues to lead to, reasonable consumers, including Plaintiff, believing that the Products could provide accurate stage-by-stage sleep tracking.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

103. Plaintiff and the California Subclass have suffered an injury in fact and have lost money as a result of and in reliance upon Defendants' Challenged Representations—namely Plaintiff and the California Subclass lost the purchase price for the Products they bought from the Defendants.

104. Defendants' conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code, § 17200. In addition, Defendants' use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code section 17200.

105. Defendants failed to avail themselves of reasonably available, lawful alternatives to further their legitimate business interests.

106. All of the conduct alleged herein occurred and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue on a daily basis until Defendants voluntarily alters their conduct or Defendants are otherwise ordered to do so.

107. Pursuant to Business and Professions Code sections 17203 and 17535, Plaintiff and the members of the California Subclass seek an order from this Court enjoining Defendants from continuing to engage, use, or employ their practice of labeling and advertising the sale and use of the Products. Likewise, Plaintiff and the members of the California Subclass seek an order requiring Defendants to disclose such misrepresentation, and to preclude Defendants' failure to disclose the existence and significance of said misrepresentation.

108. As a direct and proximate result of Defendants' misconduct in violation of the UCL, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

they paid for the Products. Further, Plaintiff and members of the California Subclass have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the UCL in restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result. Plaintiff seeks restitution only to the extent that legal claims do not provide full recovery, or to the extent class members cannot satisfy some requirements the legal claims carry.

***"Unfair" Prong***

109. Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal.App.4th 1394, 1403 (2006).

110. Defendants' action of advertising the Products with the Challenged Representations does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the Products, and receive Products of lesser standards than what they reasonably expected to receive. Consumers cannot avoid any of the injuries caused by Defendants' deceptive labeling and advertising of the Products. Accordingly, the injuries caused by Defendants' deceptive labeling and advertising outweigh any benefits.

111. Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code section 17200. They "weigh the utility of the Defendants' conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

112. Here, Defendants' conduct of advertising the Products with the Challenged Representations when, in reality, the Products could not accurately and definitively measure sleep stages has no utility and financially harms purchasers. Thus, the utility of Defendants' conduct is

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

vastly outweighed by the gravity of harm.

113. Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

114. Defendants' labeling and advertising of the Products, as alleged herein, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendants knew or should have known of their unfair conduct. Defendants' misrepresentation constitutes an unfair business practice within the meaning of California Business and Professions Code section 17200.

115. There existed reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representations.

116. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

117. Pursuant to Business and Professions Code sections 17203, Plaintiff and the California Subclass seek an order from this Court enjoining Defendants from continuing to engage, use, or employ their practices of advertising the Products with the Challenged Representations.

118. Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' unfair conduct. Plaintiff and the California Subclass paid an unwarranted premium for these Products. Specifically, Plaintiff and the California Subclass paid for Products that truly could provide accurate stage-by-stage sleep tracking. Plaintiff and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and labeling were deceptive. Accordingly, Plaintiff seeks restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

***"Fraudulent" Prong***

119. The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Super. Court*, 2 Cal.4th 1254, 1267 (1992).

120. Defendants used the Challenged Representations with the intent to sell the Products

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

to consumers, including Plaintiff and the California Subclass. The Challenged Representations are false, and Defendants knew or should have known of their falsity. The Challenged Representations are likely to deceive consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumers.

121. As alleged herein, the misrepresentations by Defendants constitute fraudulent business practice in violation of California Business & Professions Code section 17200.

122. Plaintiff and the California Subclass reasonably and detrimentally relied on the material and false Challenged Representations to their detriment in that they purchased the Products.

123. Defendants had reasonably available alternatives to further their legitimate business interests, other than the conduct described here. Defendants could have refrained from advertising the Products with the Challenged Representations.

124. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

125. Pursuant to Business and Professions Code sections 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of labeling the Products with the Challenged Representations.

126. Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' fraudulent and unfair conduct. Plaintiff paid an unwarranted premium for the Products. Specifically, Plaintiff and the California Subclass paid for products that they believed could provide accurate stage-by-stage sleep tracking. Plaintiff and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known the truth about Defendants' misleading and deceptive advertising and labeling scheme. Accordingly, Plaintiff seeks restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

***"Unlawful" Prong***

127. The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

128. Defendants' labeling of the Products, as alleged herein, violates California Civil Code

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

sections 1750, *et seq.* (the "CLRA") and California Business and Professions Code sections 17500, *et seq.* (the "FAL") as set forth below in the sections regarding those causes of action.

129. Defendants' conduct in making the false representation described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendants, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendants' misrepresentation of material facts, as set forth herein, violates California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law.

130. Defendants' packaging, labeling, and advertising of the Products, as alleged herein, are false, deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendants knew or should have known of their unlawful conduct.

131. Defendants had reasonably available alternatives to further their legitimate business interests, other than the conduct described herein. Defendants could have refrained from labeling the Products with the Challenged Representations.

132. All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct.

133. Pursuant to Business and Professions Code section 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of false and deceptive advertising of the Products.

134. Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendants' unlawful conduct. Plaintiff and the California Subclass paid an unwarranted premium for the Products. Specifically, Plaintiff and the California Subclass paid for Products that supposedly could provide accurate stage-by-stage sleep tracking, despite the fact that they could not accurately and definitively measure sleep stages. Plaintiff and the subclass would not have purchased the Products if they had known that Defendants purposely deceived consumers into believing that the Products truly conform to the Challenged Representations. Accordingly, Plaintiff

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

seeks restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

**COUNT FOUR**

**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**

**(Cal. Bus. & Prof. Code, §§ 17500, et seq.)**

**(Brought by Plaintiff on Behalf of the California Subclass)**

135. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

136. Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

137. The False Advertising Law, codified at Cal. Bus. & Prof. Code, §§ 17500, *et seq.,* prohibits "unfair, deceptive, untrue or misleading advertising[.]"

138. Defendants violated section 17500 when it advertised and marketed the Products through the unfair, deceptive, untrue, and misleading Challenged Representations disseminated to the public through the Products' advertising. This representation was false because the Products do not conform to it. The representation was material because it is likely to mislead a reasonable consumer into purchasing the Products.

139. In making and disseminating the representation alleged herein, Defendants knew or should have known that the representation was untrue or misleading, and acted in violation of section 17500.

140. Defendants' Challenged Representations were specifically designed to induce reasonable consumers, like Plaintiff and the California Subclass, to purchase the Products.

141. As a direct and proximate result of Defendants' misconduct in violation of the FAL, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of the FAL in restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies,

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

**COUNT FIVE**

**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**

**(Cal. Civ. Code, §§ 1750, et seq.)**

**(Brought by Plaintiff on Behalf of the California Subclass)**

142. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

143. Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

144. The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

145. The Products are "goods," as defined by the CLRA in California Civil Code section 1761, subdivision (a).

146. Defendants are "persons," as defined by the CLRA in California Civil Code section 1761, subdivision (c).

147. Plaintiff and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code section 1761, subdivision (d).

148. The purchase of the Products by Plaintiff and members of the California Subclass are "transactions" as defined by the CLRA under California Civil Code section 1761, subdivision (e).

149. Defendants violated the following sections of the CLRA by selling the Products to Plaintiff and the California Subclass through the false, misleading, deceptive, and fraudulent Challenged Representations:

a. Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which they do not have."

b. Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . when they are of another."

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

c. Section 1770(a)(9) by advertising the Products "with [the] intent not to sell [] as advertised."

150. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that their representations and omissions were untrue and misleading.

151. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally misled and withheld material information from consumers, including Plaintiff, to increase the sale of the Products.

152. Plaintiff and members of the California Subclass could not have reasonably avoided such injury. Plaintiff and members of the California Subclass were unaware of the existence of the facts that Defendants suppressed and failed to disclose, and Plaintiff and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

153. Plaintiff and the California Subclass suffered harm as a result of Defendants' violations of the CLRA because they relied on the Challenged Representations in deciding to purchase the Products. The Challenged Representations were a substantial factor, and were material because a reasonable consumer would consider them important in deciding whether to purchase the Products.

154. By a letter dated March 26, 2026, Plaintiff advised Defendant Oura Health Oy d/b/a Ouraring, Inc. of its false and misleading representations and omissions pursuant to California Civil Code Section 1782(a), via U.S. certified mail, return receipt requested. The notices of Defendant Oura Heath's violations and demand for remedial action, as of the filing of this complaint, did not result in adequate correction, repair, replacement, and/or other remedies by Defendants, including all remedial action set forth in the letter and as set forth under section 1782, subdivision (c).

155. As a direct and proximate result of Defendants' misconduct in violation of the CLRA, Plaintiff and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the

Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for violation of this Act in the form of damages, restitution, disgorgement of ill-gotten gains to compensate Plaintiff and the California Subclass for said monies.

156. Given that Defendants' conduct violated California Civil Code section 1780, Plaintiff and members of the California Subclass are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendants' violations of the CLRA. Plaintiff and the California Subclass have no adequate remedy at law. Without equitable relief, Defendants' unfair and deceptive practices will continue to harm Plaintiff and the California Subclass.

157. Defendants' unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendants' misconduct is malicious as Defendants acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendants willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendants were, at all times, aware of the probable dangerous consequences of their conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendants' misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendants' misconduct is fraudulent as Defendants, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendants. Accordingly, Plaintiff seeks an award of punitive damages against Defendants.

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

**COUNT SIX**

**BREACH OF EXPRESS WARRANTY**

**(Cal. Comm. Code, § 2313)**

**(Brought by Plaintiff on Behalf of the California Subclass)**

158. Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

159. Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

160. Defendants manufactured, marketed, advertised, labeled, distributed, and sold the Products to Plaintiff and members of the California Subclass.

161. In connection with the sale of the Products, Defendants made express warranties to Plaintiff and members of the California Subclass by affirmations of fact and promises relating to the Products that became part of the basis of the bargain. Specifically, Defendants expressly warranted that the Products could provide accurate stage-by-stage sleep tracking via a pervasive marketing campaign and brand strategy, including but not limited to the Defendants' websites and social media accounts, designed to identify and distinguish the Products with the Challenged Representations.

162. The Challenged Representations constitute affirmations of fact regarding a specific, material attribute of the Products, not mere puffery or opinion. The representations conveys to reasonable consumers that the Products could accurately and definitively measure sleep stages.

163. The Challenged Representations became part of the basis of the bargain for Plaintiff and members of the California Subclass. Consumers seeking sleep tracking products specifically prefer and desire products that could provide accurate stage-by-stage sleep tracking data.

164. Plaintiff and members of the California Subclass relied on Defendants' express warranty in deciding to purchase the Products. The Challenged Representations appeared uniformly on every unit of the Products sold to Plaintiff and the California Subclass, and Defendants' marketing campaign reinforced the representation at every consumer touchpoint. Plaintiff and members of the California Subclass would not have purchased the Products, or would not have paid

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

the prices they paid, absent Defendants' express warranty that they could provide accurate stage-by-stage sleep tracking.

165. Defendants breached the express warranty because the Products could not accurately and definitively measure sleep stages. The Products lack the sensors required to directly measure neurological activities that define sleep stages.

166. Defendants were provided notice of their breach of express warranties prior to Plaintiff initiating this action. On or about March 26, 2026, Plaintiff's counsel, acting on behalf of all members of the California Subclass, mailed a Demand Letter, via U.S. certified mail, return receipt requested, to Defendant Oura Health Oy d/b/a Ouraring Inc. at its headquarters and principal place of business (222 Kearny Street, 7th Floor San Francisco, CA 94108) and its registered agent for service of process. Defendants were further on notice of the breach through publicly available scientific literature and studies, including ones funded by themselves, demonstrating that the Products could not accurately and definitively measure sleep stages.

167. As a direct and proximate result of Defendants' breach of express warranty, Plaintiff and members of the Class have suffered damages. Plaintiff and members of the Class did not receive the benefit of the bargain because they paid for Products expressly warranted with the Challenged Representations but received Products that could not accurately and definitively measure sleep stages. Plaintiff and members of the Class overpaid for the Products based on Defendants' false express warranty and are entitled to the difference between the value of the Products as warranted and the actual value of the Products as delivered, together with incidental and consequential damages as permitted under California Commercial Code §§ 2714 and 2715.

168. Plaintiff and members of the Class are further entitled to all other relief permitted by law, including but not limited to costs of suit.

## COUNT SEVEN

## SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY

## (Cal. Civ. Code §§ 1792, 1791.1, et seq)

## (Brought by Plaintiff on Behalf of the California Subclass)

169. Plaintiff and the Class incorporate by reference each preceding and succeeding

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

paragraph as though fully set forth at length herein.

170. Plaintiff brings this cause of action against Defendants on behalf of herself and the California Subclass.

171. Plaintiff and the other California Subclass members who purchased the Products in California are "buyers" within the meaning of California Civil Code § 1791(b).

172. The Products are "consumer goods" within the meaning of California Civil Code § 1791(a).

173. Defendants are a "manufacturers" of the Products within the meaning of California Civil Code § 1791(j).

174. Defendants impliedly warranted to Plaintiff and the other California Subclass members that the Products were "merchantable" within the meaning of California Civil Code §§ 1791.1(a) & 1792; however, the Products do not have the quality that a buyer would reasonably expect.

175. California Civil Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

176. The Products would not pass without objection in the trade because the Products lack the sensors required to directly measure neurological activities that define sleep stages, rendering the Products unfit for their advertised purpose of providing stage-by-stage tracking.

177. Defendants provided Plaintiff and the California Subclass members with an implied warranty that the Products, and any components thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Products, however, are not fit for their ordinary purpose because, inter alia, the Products lack the sensors required to directly measure neurological activities that define sleep stages, contrary to the representations made in the Products' advertising.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

178. Defendants impliedly warranted that the Products were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Products manufactured, marketed, distributed, and/or sold by Defendants were suitable for use as a sleep tracker that could provide accurate stage-by-stage sleep tracking; and (ii) a warranty that the Products would be fit for their intended use, accurately and definitively measuring sleep stages, as represented throughout Defendants' marketing campaign.

179. Contrary to the applicable implied warranties, the Products were not fit for their ordinary and intended purpose. Instead, the Products are defective and fail to conform to the promises and affirmations made throughout the Products' advertising campaign, including, but not limited to, the false Challenged Representations, because the Products lack the sensors required to directly measure neurological activities that define sleep.

180. As a direct and proximate result of' Defendants' breach of the implied warranty of merchantability, Plaintiff and the California Subclass members received goods whose condition substantially impairs their value to Plaintiff and the California Subclass members. Plaintiff and the California Subclass members have been damaged as a result of overpaying for the Products, which were sold at a premium based on the false Challenged Representations, and which do not deliver the accurate stage-by-stage sleep tracking attributes for which Plaintiff and the California Subclass members bargained.

181. Pursuant to California Civil Code §§ 1791.1(d) and 1794, Plaintiff and the other California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Products, or the overpayment or diminution in value of their Products.

182. Pursuant to Cal. Civ. Code § 1794, Plaintiff and the other California Subclass members are entitled to attorneys' fees and costs.

183. Defendants' actions, as complained of herein, breached the implied warranty that the Products were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendants as follows:

a. **Certification:** For an order certifying this action as a class action, appointing Plaintiff as the Class Representative, and appointing Plaintiff's Counsel as Class Counsel;

b. **Declaratory Relief:** For an order declaring that Defendants' conduct violates the statutes and laws referenced herein consistent with applicable law and pursuant to only those causes of action so permitted;

c. **Injunction:** For an order requiring Defendants to alter their business practices to prevent or mitigate the risk of the consumer deception and violations of law outlined herein. This includes, for example, orders that Defendants immediately cease and desist from making the Challenged Representations in violation of law; that enjoin Defendants from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; that require Defendants to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendants' unlawful conduct; and/or that require Defendants to take all further and just corrective action, consistent with applicable law and pursuant to only those causes of action so permitted;

d. **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiff and the Class requested herein, consistent with applicable law and pursuant to only those causes of action so permitted;

e. **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with applicable law and pursuant to only those causes of action so permitted;

f. **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with applicable law and pursuant to only those causes of action so permitted;

g. **Pre/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with applicable law and pursuant to only those causes of action so permitted; and

h. **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues and causes of action so triable.

DATED: August 20, 2026

Respectfully submitted,

**CLARKSON LAW FIRM, P.C.**

*/s/ Ryan J. Clarkson*

Ryan J. Clarkson, Esq.
Shireen Clarkson, Esq.
Yana Hart, Esq.
Cassandra Rasmussen, Esq.
Jay Zheng, Esq.
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050